No. 84-437

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

F. CLIFFORD HOBBS,

        Plaintiff and Appellant,

  -vs-

PACIFIC HIDE AND FUR DEPOT, a Montana
corporation,

        Defendant and Respondent.

APPEAL FROM: District Court of the Eighth Judicial District,
            In and for the County of Cascade,
            The Honorable Joel G. Roth, Judge presiding.

COUNSEL OF RECORD:

    For ~~Appellant~~ Respondent:

        Charles R. Johnson; Marra, Wenz, Johnson & Hopkins,
        Great Falls, Montana
        J. Marquis Eastwood, Stephen D. Bell; Dorsey & Whitney,
        Minneapolis, Minnesota

    For ~~Respondent~~ Appellant:

        Tom L. Lewis; Regnier, Lewis & Boland, Great Falls,
        Montana
        Kenneth R. Olson; Baiz & Olson, Great Falls, Montana

Submitted: May 12, 1988

Decided: March 31, 1989

Filed:

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

F. Clifford Hobbs sued Pacific Hide and Fur Depot for his claimed wrongful discharge from employment in the District Court, Eighth Judicial District, Cascade County. His theories of recovery, which were submitted to the jury, included actual fraud, constructive fraud, breach of the implied covenant of good faith and fair dealing, and negligent misrepresentation. The jury verdict found against Hobbs on all of the theories of recovery, and, judgment having been rendered thereon in favor of the defendant, Hobbs appealed from the judgment to this Court. We reverse and remand for new trial as to the claim for breach of an implied covenant of good faith and fair dealing, and affirm as to all other claims for relief. The reasons follow.

Pacific Hide and Fur Depot is a Montana corporation that recycles scrap iron, copper, brass and aluminum, buys and sells cattle and game hides, fur, and sells steel, farm products and hardware. It has corporate offices in Great Falls, Montana, and 32 operating branches in the states of Montana, Wyoming, Idaho, Washington and Oregon. Its president at the time of the discharge of Hobbs was Joe Thiebes, Jr., who died on May 1, 1982, two years before trial. Pacific had 450 employees in 1981. In 1983, Pacific reduced its work force to 350 employees.

Clifford Hobbs began his employment with Pacific in December, 1978. At that time, he had been employed in the retail steel industry for approximately 15 years. He had met Roger Palmer, Pacific's Billings branch manager and apparently came in the fall of 1978 to Great Falls for an

employment interview. Hobbs claims that Palmer represented to him that he would have a bright future and job security with Pacific as long as he competently performed his job. He claims he was promised substantial salary, stock in the company, annual bonuses, and opportunity for advancement. He claims that these promises induced him to leave his employment with Wisconsin Steel, to move his family from Denver to Great Falls and to accept the position of director of corporate purchasing for Pacific.

Hobbs maintains that Palmer made other promises which need not be enumerated here except to say that Hobbs claims he was painted a glowing future.

After Hobbs went to work for Pacific, substantial friction developed between Palmer and Hobbs. Nonetheless, on August 14, 1980, he was promoted and given additional responsibility as manager of Branch 1 Steel in Great Falls. Although he was now holding two management jobs, as director of corporate purchasing, and as manager of Branch 1 Steel, Hobbs contended that his compensation was substantially below other branch managers. He also contends he never received a promised substantial increase in his bonus.

Under his employment, Hobbs was required to report to Palmer, although other employees at the same management level reported directly to the president or vice president of Pacific. Palmer continued to be disruptive, and on one occasion, increased the price of a contract by two percent over a firm price that Hobbs had negotiated. This action resulted in the discipline of Palmer, and his removal as superior of Hobbs, after which Roger Palmer told Cliff Hobbs that Palmer was "going to get him."

A few months later, however, the executive vice president placed Roger Palmer back over the purchasing department and required Hobbs to report directly to Palmer.

By April 15, 1981, the executive vice president and Palmer determined that Hobbs would handle only purchasing, and he would again report to Roger Palmer. Other managers reported having trouble with Palmer.

Hobbs was terminated from his employment on September 15, 1981, without prior notice. The decision to terminate Hobbs was made after a meeting between Thiebes, Vosburg, the executive vice president, and Palmer on September 15, 1981. At the same time, Thiebes circulated a letter to the other managers stating that Hobbs had not worked out as manager of Branch 1, although he had done an excellent job in purchasing. The letter stated it was a "subject lesson" to all managers, and went on to state that the conflicts between Palmer and Hobbs "should now be resolved."

Hobbs maintains that during the trial it was demonstrated that the problems at Branch 1, a drop in sales, low margin on sales, and a write-off of bad debts were not Hobbs' fault. No other management level official was terminated. Hobbs also claims that other managers, before and after his termination, had worse records, but were not fired.

Roger Palmer was terminated from the company in May, 1982, apparently because of unresolved intra-company conflicts with other managers.

Other pertinent facts will appear under the issues to which they pertain.

## I

Hobbs' first attack is upon instructions given to the jury relating to the theory of breach of the implied covenant of good faith and fair dealing. Hobbs contends that the given instructions were inadequate, placed an improper burden of proof upon the plaintiff, and amounted to a directed verdict in favor of the defendant upon the issue. From our

examination, we find the instructions inadequate, confusing and misleading, and therefore requiring reversal.

First, a resume of pertinent cases from this Court is in order. In Gates v. Life of Montana Insurance Company (1982), 196 Mont. 178, 638 P.2d 1063 (Gates I), we had an employee who was hired under an oral contract of indefinite duration. After she was employed, the employer issued a handbook, which assured employees that they would be given a hearing before termination. Gates was fired without a hearing. The employer claimed the right to discharge Gates without a hearing because she was an at-will employee. This Court reversed a summary judgment in favor of the employer, saying:

> . . . The circumstances of this case are that the employee entered into an employment contract terminable at the will of either party at any time. The employer later promulgated a handbook of personnel policies establishing certain procedures with regard to terminations. The employer need not have done so, but presumably sought to secure an orderly, cooperative and loyal work force by establishing uniform policies. The employee, having faith that she would be treated fairly, then developed the peace of mind associated with job security. If the employer has failed to follow its own policies, the peace of mind of its employees is shattered and an injustice is done.
>
> We hold that a covenant of good faith and fair dealing was implied in the employment contract of the appellant . . .

Gates, 638 P.2d at 1067.

On remand to the District Court, Gates' case was tried before a jury, which resulted in a verdict in her favor for both compensatory and punitive damages. In Gates v. Life of Montana Insurance Company (1983), 205 Mont. 304, 668 P.2d 213 (Gates II), we sustained the punitive damage award on the grounds that a breach of an implied covenant for good faith and fair dealing in employment constituted a tort.

Dare v. Montana Petroleum Marketing Company was decided by this Court in 1984. 212 Mont. 274, 687 P.2d 1015. The District Court had granted summary judgment against Dare because no handbook existed, such as in Gates. This Court stated:

> . . . We conclude that the District Court construed Gates too narrowly.
>
> Whether a covenant of good faith and fair dealing is implied in the particular case depends upon objective manifestations by the employer giving rise to the employees' reasonable belief that he or she has job security and will be treated fairly. Gates, 638 at 1067, 39 St.Rep. at 20. The presence of such facts indicates that the term of employment has gone beyond the indefinite period contemplated in the at will employment statute, section 39-2-503, MCA, and is founded upon some more secure and objective basis. In such cases, the implied covenant protects the investment of the employee who in good faith accepts and maintains employment reasonably believing their job is secure so long as they perform their duties satisfactorily. Such an employee is protected from bad faith or unfair treatment by the employer to which the employee may be subject due to the inherent inequality of bargaining power present in many employment relationships. The implied covenant seeks to strike a balance between the interests of the employer in controlling the work force and the interests of the employee in job security. Gates, 638 P.2d at 1066-67, 39 St.Rep. at 20.
>
> We hold that an employment handbook as promulgated by the employer in Gates is not essential to a cause of action for breach of the implied covenant of good faith and fair dealing. Implication of the covenant depends upon existence of objective manifestations by the employer giving rise to the employees reasonable belief that he or she has job security and will be treated fairly. (Emphasis supplied.)

Dare, 687 P.2d at 1020.

In Crenshaw v. Bozeman Deaconess Hospital (1984), 213 Mont. 488, 693 P.2d 487, this Court held that a probationary employee was owed the duty of good faith under Gates I, and that the duty coexisted with the right to terminate an at-will employee. This Court said:

> . . . This requirement of good faith and fair dealing does not conflict with section 39-2-503, MCA, [the at-will employment statute] but merely supplements it. Employers can still terminate untenured employees at-will and without notice. They simply may not do so in bad faith or unfairly without becoming liable for damages.

Crenshaw, 693 P.2d at 492. See also, Nye v. Montana Livestock Department (1982), 196 Mont. 222, 639 P.2d 498.

The nature of an implied covenant of good faith and fair dealing in a contract was described by this Court in Nicholson v. United Pacific Insurance Company (Mont. 1985), 710 P.2d 1342, 42 St.Rep. 1822. There we said in part:

> . . . but whether performing or breaching, each party has a justifiable expectation that the other will act as a reasonable person. (Citing a case.) The nature and extent of an implied covenant of good faith and fair dealing is measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously, or unreasonably, that conduct exceeds the justifiable expectations of the second party. The second party then should be compensated for damages resulting from the other's culpable conduct. (Emphasis supplied.)

710 P.2d at 1348.

The District Court in this case before us gave two instructions that related to the issue of the implied covenant and good faith and fair dealing:

COURT'S INSTRUCTION NO. 17

Mr. Hobbs has made claims concerning his dismissal from employment with Pacific Hide and Fur. You should understand that generally an employment

contract for an indefinite term or period may be terminated at any time by either party, provided that party gives notice to the other. However, no prior notice is required, so that an employer or employee may tell the other that the employment contract is terminated on the same day notice is given. If you find that Mr. Hobbs and Pacific had an employment contract with no specified term, then Pacific had the right to terminate Mr. Hobbs's employment at any time and for any reason. That is the general rule. I will now instruct you on the causes of action for breach of the implied covenant of good faith and fair dealing. If you find that Mr. Hobbs has proven by a preponderance of the evidence that the defendant breached the implied covenant of good faith and fair dealing, then you may find for Mr. Hobbs. But if not, then you must apply the general rule that an employment contract can be terminated for any reason or no reason at all. Good cause need not be shown for the termination.

An employer is entitled to be motivated by and to serve its own legitimate business interests; an employer must have wide latitude in deciding whom it will employ in the face of the uncertainties of the business world; and an employer needs flexibility in the face of changing circumstances.

## COURT'S INSTRUCTION NO. 19

You are instructed that the defendant Pacific Hide and Fur Depot owed plaintiff Clifford Hobbs an implied-in-law duty of good faith and fair dealing arising out of the employer/employee relationship that existed between the parties. In considering whether the defendant acted in bad faith in the manner in which plaintiff Clifford Hobbs was treated during the employment relationship and at the time the plaintiff was discharged, you should consider all the evidence which tends to establish either good faith or bad faith. If you find that the defendant has violated this obligation imposed by law, the plaintiff is entitled to be compensated for all detriment or injury proximately caused thereby whether that detriment or injury could have been anticipated or not.

Taken together, the court's instructions failed to tell the jury the nature and extent of the implied covenant of good faith and fair dealing. The instructions informed the jury that as a matter of law Pacific owed Hobbs an implied in law duty of good faith and fair dealing, but did not tell the jury that the implied covenant is measured in a particular contract by the justifiable expectations of the parties. Nicholson, supra. We therefore hold that the cause must be reversed for the failure to give proper instructions on this issue. A party has a right to have instructions given which are adaptable to his theory of the case. Northwestern Union Trust Company v. Worm (1983), 204 Mont. 184, 663 P.2d 325.

Without binding either counsel or the District Court on retrial, we suggest that instructions to the jury might properly include the following:

> Montana statutory law provides that an employment relationship having no specific duration may be terminated at the will of either party on notice to the other. This is referred to as the at-will employment doctrine.

> However, if there are objective manifestations by the employer giving rise to a reasonable belief on the part of the employee that he has job security and will be treated fairly, the right of the employer to terminate the employee at will is limited by a covenant of good faith and fair dealing which the law implies into the employment relationship. An employer may still terminate an employee at will and without prior notice; however, the implied covenant of good faith and fair dealing requires the employer to have a fair and honest reason for termination, and not to act arbitrarily, capriciously or unreasonably.

> In this case the covenant of good faith and fair dealing is implied into the employment relationship, and you are instructed that a breach of this covenant would render the employer liable to the employee for damages.

- 9 -

In determining whether the defendant violated the duty of good faith and fair dealing, you must balance the interests of the defendant in controlling its work force with the interest of the plaintiff in job security. An employer such as Pacific is entitled to be motivated by and to serve its own legitimate business interest, and must be given discretion in determining who it will employ and retain in employment.

Thus, if the employer is motivated to discharge the employee for reasons unfair or not honest, the employee is entitled to recover damages proximately caused by the breach. On the other hand, if the employer was motivated by honest business reasons in discharging the employee, the employer had the right to terminate the employment on the same day as notice is given for the discharge.

## II

Hobbs maintains that the District Court committed reversible error by the manner in which it controlled the discovery and pretrial proceedings in this case.

There are two items of pretrial discovery that ought to be made available to Hobbs before any subsequent retrial.

Prior to the trial in the District Court, Hobbs requested of the defendant corporation that it produce two copies of all federal and state income tax records of the defendant corporation for the years 1979 through 1982. Inasmuch as Thiebes' letter terminating Hobbs represented that one of the reasons for the termination was difficult economic times adversely affecting his financial standing in the corporation, the income tax records of the corporation were relevant to the reasons stated. Rule 26(b)(1), M.R.Civ.P. It appears that Hobbs was entitled to production of these documents for his pretrial preparation, and for use at the trial as evidence.

Also prior to the trial in the District Court, Hobbs requested of the defendant corporation information as to the salary and annual bonuses paid to all of the branch managers of the corporation during 1979, 1980 and 1981. The court granted, after objection, the motion as to the salary and annual bonuses paid to the branch managers of Branches 1, 2 and 40, and as to the other five branch managers of branches that sold steel in 1979, 1980 and 1981, those who received the highest salary and annual bonuses in said years.

During the trial, counsel for Pacific, in cross-examining Mr. Carestia, Hobbs' financial expert, used information relating to the salaries and bonuses of branch managers for the additional years of 1982 and 1983. An argument ensued between counsel before the court in chambers as to whether the information relating to the years 1982 and 1983 had improperly been withheld from Hobbs' counsel so that it was impossible to advise Carestia, prior to the trial, of such information in the preparation of his testimony. The record is not clear to us as to which counsel was correct with respect to whether the information had been requested or supplied in time. In any future retrial of this cause, we direct that upon a proper request for discovery, information that may be used by either party in direct or cross-examination of witnesses must be supplied in accordance with the request for production.

In this case, the District Court permitted the corporation's counsel to cross-examine Carestia on information which had not been supplied to the expert. The court felt that the jury was aware of the fact that the witness did not have the information that he was being questioned about and that on redirect examination by Hobbs' counsel, the jury would be made well aware of it. On that basis, the District Court permitted the cross-examination

over objection. It is probable that the District Court was unable, as we are unable, to determine which of the parties was right as to the extent of the request for the production of documents. In any event, this issue can be obviated on retrial if, on proper request for production, information is exchanged as to documents that will be used either for direct or cross-examination of either parties' witnesses on retrial. The objective of the District Court in controlling and regulating discovery is to insure a fair trial to all concerned, neither according one party an unfair advantage nor placing the other at a disadvantage. Massaro v. Dunham (1979), 184 Mont. 400, 603 P.2d 249; Lindberg v. Leatham Bros., Inc. (1985), 215 Mont. 11, 693 P.2d 1234.

We find no merit in other issues raised by Hobbs as to discovery as regulated by the District Court, and it is unnecessary to set them forth here.

III

At the time of the trial in this cause in the District Court, the corporation president involved in terminating Hobbs had died. In the course of the trial, through several witnesses, statements made by the deceased Thiebes to those witnesses were permitted into evidence. Hobbs raises a general objection to this kind of evidence, claiming hearsay.

At issue in this case, as indicated in the proposed instructions foregoing, is whether the employer was motivated to discharge the employee for reasons unfair or not honest, as a breach of the implied covenant of good faith and fair dealing. Therefore, the facts relating to the method used by the deceased Thiebes in deciding to terminate Hobbs were relevant to those issues. Thus, it may be that statements made by Thiebes to others relating to the discharge of Hobbs would be indicative of the facts considered by him in making

the discharge, as to whether he was acting fairly and honestly.

Whether a witness is available or not, under Rule 803(3), M.R.Evid., statements are not excluded by the hearsay rule if those statements indicate the then existing mental, emotional or physical condition of the declarant. When a declarant is unavailable as a witness, as for reason of death, Rule 804(a)(4), his statements are not excluded by the hearsay rule if there are comparable circumstantial guarantees of trustworthiness. Rule 804(a)(b)(5), M.R.Evid. Whether there are circumstantial guarantees of trustworthiness is a matter for determination by the District Court in the first instance which will be upheld in this Court absent an abuse of discretion.

In any retrial of this case, those rules should guide the District Court in considering whether to admit such statements.

IV

Hobbs objects to an instruction given by the District Court on the subject of constructive fraud on the ground that it was repetitious and misleading. The District Court submitted the issue of constructive fraud to the jury in a special interrogatory and the jury responded that the defendant had not committed constructive fraud which was the proximate cause of the damages to Hobbs.

We do not comment on the instruction given by the District Court in this case for the reason that we find plaintiff's theory or basis for constructive fraud is not properly conceived in this case. Statements were made by Palmer to Hobbs before his employment that Pacific was a "gold mine," that Palmer was offering to Hobbs the "opportunity of a lifetime," and that Hobbs would be reporting directly to the president or executive vice

president of the company and not to Palmer. Such statements are not the source of plaintiff's problems in this case nor are they demonstrably false. The statements may arguably have given rise to justifiable expectations in Hobbs about his employment, but they do not constitute a basis for constructive fraud. It is true that defendant's fraudulent intent is not a necessary element in an action against it for constructive fraud, § 28-2-406(1), MCA, nor must there exist a fiduciary or confidential relationship between the plaintiff and the defendant, Mends v. Dykstra (1981), 195 Mont. 440, 449-50, 637 P.2d 502, 507-08. Here, however, given the statements made, their nature, and the circumstances existing between the parties at the time the statements were made, Hobbs can show no duty imposed on Palmer or any other officer of Pacific "to speak out on the circumstances," indicating that the statements were false or misleading and should not be relied on. Palmer seems only to have expressed his opinion, belief or judgment on the matters stated and not necessarily statements of positive fact. See Restatement (Second) of Torts § 538A Comments a-g (1977). These statements do not have in them the elements of concealment or falsity that characterize the statements or representations which led to the contract in McGregor v. Mommer (Mont. 1986), 714 P.2d 536, 43 St.Rep. 206, upon which case Hobbs relies on appeal.

V

Accordingly, the judgment of the District Court in this case is reversed, and the cause remanded for retrial in accordance with this Opinion. Costs to plaintiff.

_____
Justice

We Concur:

_____
              Chief Justice

John Conway Harrison
_____


_____

_____

_____
               Justices

Mr. Justice Fred J. Weber dissents:

The majority concludes that reversal is required in this case because the instructions did not tell the jury that the implied covenant is measured by the justifiable expectations of the parties. This conclusion is based upon Nicholson v. United Pacific Insurance Company (Mont. 1985), 710 P.2d 1342, 42 St.Rep. 1822. It seems inappropriate to apply a legal theory which had not yet been stated by this Court. In the present case, the jury instructions were given on May 1, 1984, nearly one year prior to the 1985 Nicholson decision. I conclude there is no reversible error, and I would affirm the jury verdict and judgment for the defendant.

The facts stated in the majority opinion present a very favorable picture of the plaintiff's claim. No facts are presented which suggest a basis for the jury verdict for the defendant. However, the record demonstrates there were approximately 30 witnesses who testified in behalf of the defendant during a month long trial. I believe it appropriate to set forth some of the facts which support the jury's verdict.

When plaintiff first went to work for Pacific Hide and Fur Depot (Pacific), Mr. Palmer testified that Mr. Thiebes authorized him to offer plaintiff a $32,000 per year salary plus an unknown bonus. There is no testimony from Pacific that anyone represented to plaintiff that he would receive any higher salary. Furthermore, plaintiff himself testified that he realized any bonus he might receive would be discretionary with Mr. Thiebes and would have to be approved by Mr. Thiebes prior to receipt. Mr. Palmer also testified that plaintiff said he was anxious to leave Colorado and move to Montana. This testimony is relevant in considering the argument that the plaintiff was enticed to move his family

16

from Denver to Great Falls based upon Pacific's representations of a "glowing future."

Several Pacific employees testified as to the dissension between plaintiff and Mr. Palmer and the disruptive effect it had on the purchasing department under plaintiff's supervision. The Vice-president of Pacific testified that plaintiff had an obsession with Mr. Palmer's interference with the purchasing department. An agent within the department testified to the effect that plaintiff was very candid about his dislike of Mr. Palmer and his disapproval of Mr. Palmer's ideas and the way he did things. Another purchasing agent testified that employees within the department found plaintiff to be harsh and abusive, and that under his supervision, the department had experienced a considerable loss of morale. The agent testified that he had considered resigning due to the pressure of having to work for plaintiff and had expressed that inclination to Mr. Thiebes. Plaintiff agreed that the problems he had with Mr. Palmer created confusion within the corporation and that the confusion spilled over into other corporate branches.

Witnesses testified that the plaintiff frequently complained about his immediate supervisor to individuals outside the company. These complaints were expressed to one individual who testified that because of plaintiff's statements, he formed a negative opinion of Mr. Palmer, and he believed that plaintiff's statements were destructive to the interests of Pacific. Another individual unrelated to the company testified that plaintiff's preoccupation with Mr. Palmer and his constant talk about the inner workings of Pacific demonstrated a lack of professionalism. At one point, plaintiff told this individual about an "ultimatum" which he had given Mr. Thiebes a few months prior to his termination, indicating that "the situation was unworkable" and that "it will either

17

be Roger or him, and that was the way he wanted to resolve it."

The record contains substantial evidence that the plaintiff had been advised of the need to cooperate with Mr. Palmer, his superior, and that if his performance did not improve, the plaintiff could be terminated. The evidence further demonstrated that shortly thereafter, the plaintiff contacted another steel company concerning alternative employment, and this contact was made prior to his termination by Pacific.

Mr. Thiebes ultimately made the decision to terminate the plaintiff. Because Mr. Thiebes died prior to trial, we are not able to ascertain all of his reasons for the termination. The record does establish that Mr. Thiebes was well aware of the problems between the plaintiff and Mr. Palmer. He had also been told that the purchasing department was experiencing morale problems and that an employee was considering resignation. Supervisory employees of Pacific had indicated to Mr. Thiebes that if Pacific had to choose between the plaintiff and Mr. Palmer, it would be wise to terminate the plaintiff and retain Mr. Palmer. Mr. Palmer was described by several other Pacific employees as being more knowledgeable of the steel business and more dedicated to that business than was the plaintiff.

Other key employees testified that the plaintiff experienced a lack of effort when he was managing branch I of the steel business as well corporate purchasing. Mr. Thiebes' letter of termination stated that the economic times and the plaintiff's inability to manage branch I along with his purchasing duties were the primary causes for his termination.

Such evidence supports the contention of the defendant that its decision to terminate the plaintiff was a sound

18

business decision. The jury accepted that idea, as demonstrated by the following question presented to it:

> Do you find that defendant Pacific Hide and Fur breached an implied covenant of good faith and fair dealing to the plaintiff, which was a proximate cause of damages to plaintiff Clifford Hobbs?

To that question the jury answered, "No." There is clearly substantial evidence to support the conclusion of the jury. I do not find a factual basis for trial reversal. In ordering a retrial, I note that almost 8 years have passed since the date of termination and 5 years since the trial. We are posing a difficult trial problem for all parties by the present reversal.

The basic reason for reversal stated in part I of the majority opinion is that the instructions were inadequate. The problem instructions were 17 and 19. Instruction 19 stated:

> You are instructed that the defendant Pacific Hide and Fur Depot owed plaintiff Clifford Hobbs an implied-in-law duty of good faith and fair dealing arising out of the employer/employee relationship that existed between the parties. In considering whether the defendant acted in bad faith in the manner in which plaintiff Clifford Hobbs was treated during the employment relationship and at the time the plaintiff was discharged, you should consider all the evidence which tends to establish either good faith or bad faith. If you find that the defendant has violated this obligation imposed by law, the plaintiff is entitled to be compensated for all detriment or injury proximately caused thereby whether that detriment or injury could have been anticipated or not.

The instruction stated that the District Court concluded that the duty of good faith and fair dealing did arise in the present contract. As a result there was no need to require the jury to weigh any circumstances to determine if such a

19

covenant was appropriate. The majority refers to <u>Gates I</u>, pointing to the circumstances under which a covenant of good faith and fair dealing may be implied. That does not appear relevant where the District Court already concluded that the covenant did arise in the present contract. In a similar manner, the majority refers to <u>Dare</u> with emphasis upon the objective manifestations by an employer from which the covenant may be implied. Again, that does not appear relevant where the trial court had already reached that conclusion.

As previously mentioned, that "measurement" of the justifiable expectations of the parties had not been enunciated by this Court at the time of trial. While the <u>Nicholson</u> wording was not used in the present case, it seems to me that instruction 19 contains a good explanation of the duty. That instruction stated that in considering whether the defendant acted in bad faith, the jury may consider the manner in which the plaintiff was treated <u>during the employment relationship</u> and <u>at the time the plaintiff was discharged</u>. The instruction further emphasizes that the jury should consider <u>all the evidence</u> which tends to establish either good or bad faith. It ends with the statement that if the jury finds the defendant has violated this obligation, the plaintiff is entitled to compensation for all injury proximately caused by that violation. I conclude this is a fair statement of the law as it existed and was available to the trial judge and attorneys during the 1984 trial.

The jury was also instructed on the nature of the at-will employment contract and how the cause of action for breach of the implied covenant interplays with that relationship in instruction 17 which states in part that:

> If you find that Mr. Hobbs has proven by a preponderance of the evidence that the defendant breached the implied covenant of good faith and fair

20

dealing, then you must find for Mr. Hobbs. But if not, then you must apply the general rule that an employment contract can be terminated for any reason or no reason at all.

I conclude there is no basis for reversal because of the wording of jury instructions 17 and 19.

I would affirm the verdict of the jury and the judgment of the District Court.

_____
Justice

Mr. Justice L. C. Gulbrandson concurs in the foregoing dissent.

_____
Justice